UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

LOIS BENOIT,

                                        Plaintiff,


                v.                              6:05-CV-0417
                                                (LEK/GJD)
COMMISSIONER OF SOCIAL SECURITY,
                                Defendant.
_____

THOMAS ERWIN, ESQ., Attorney for Plaintiff
WILLIAM H. PEASE, Assistant U.S. Attorney for Defendant

GUSTAVE J. DI BIANCO, Magistrate Judge

## REPORT-RECOMMENDATION

Plaintiff commenced this action pursuant to 42 U.S.C. § 405(g) to review the

final decision of the Commissioner of Social Security, denying her application for

disability insurance benefits.

## PROCEDURAL HISTORY

Plaintiff filed an application for a closed period of disability benefits on

November 21, 2001, alleging disability between October 3, 2000 and September

2002.  (Administrative Transcript ("Tr") at 39-41).  The application was denied

initially on February 28, 2002. (Tr. 22-25).  Plaintiff requested a hearing before an

Administrative Law Judge ("ALJ") which was held on May 15, 2003. (Tr. 218-45).

On July 21, 2003, the ALJ issued a decision denying benefits. (Tr. 12-21).  The ALJ's

decision became the final decision of the Commissioner when the Appeals Council

denied plaintiff's request for review on February 25, 2005.  (Tr. 4-6).

## CONTENTIONS

Plaintiff raises five claims for this court's review:

1.  The ALJ erred in determining that plaintiff's impairments did not meet or equal the severity of Listed Impairments 12.04 or 12.06. Brief at 7-8.

2.  ALJ failed to follow the treating physician rule. Brief at 8-9.

3.  The ALJ failed to properly assess plaintiff's credibility. Brief at 9-11.

4.  The ALJ's residual functional capacity (RFC) assessment is not supported by substantial evidence. Brief at 11-12.

5.  The ALJ's determination that plaintiff could return to her previous work is not supported by substantial evidence. Brief at 13.

Plaintiff argues for reversal of the administrative decision and asks the court to remand for calculation of benefits. Brief at 13-14.  Defendant argues that the Commissioner's decision is supported by substantial evidence, and the complaint should be dismissed.

## FACTS

**1.   Non-Medical Facts**

At the May 2003 hearing, plaintiff was fifty years old, married, and had three adult children. (Tr. 222, 223).  Plaintiff had been employed as a music teacher for ten years, beginning September 1990. (Tr. 46).  Between October 2000 and September 2002, plaintiff was on a medical leave of absence because of a nervous breakdown. (Tr. 66, 232).

Plaintiff testified that her disability began when she suddenly left school in

New York on October 3, 2000, and without any notice to her husband or her children, boarded a train to Florida. (Tr. 233).  Plaintiff testified that she did not know where she was for two days. (Tr. 233).  When plaintiff arrived in Florida, she stayed with her cousin, but did not contact her family in New York. (Tr. 233-34).  Initially, plaintiff's family did not know where she was and filed a police report. (Tr. 233-34).

Plaintiff testified that after a few days, her cousin convinced plaintiff to call her sister who notified plaintiff's family that she was in Florida. (Tr. 234).  Plaintiff remained in Florida for about a month before returning home. (Tr. 233-34).  Plaintiff testified that her mental "breakdown" occurred because of stress caused by harassment from her school's principal. (Tr. 226-27).  Specifically, plaintiff testified about one incident, during which the principal pushed plaintiff into a wall during a disagreement. (Tr. 227).

Plaintiff testified that when she returned home she remained inside her house and only left the house to go to doctors' appointments. (Tr. 234).  Plaintiff stated that she was afraid of people, and did not go shopping or socialize with other people for one year. (Tr. 234).  Plaintiff also testified that it took one year before she was able to go out in public again. (Tr. 234).  Plaintiff stated that it was "months" before she could even return to church. (Tr. 236).  She stated that she first returned to church for a Christmas Eve service in 2000, but did not begin attending church regularly until late the next spring. (Tr. 232, 236, 242).  The first time plaintiff returned to the school in which she worked was in the Spring of 2002 when she attended her nephew's

3

basketball game. (Tr. 239).  In September 2002, plaintiff returned to full-time

teaching at her school. (Tr. 212).

## 2.     Medical Facts

Plaintiff claims disability for the period between October 3, 2000 until she

returned to work in September of 2002, based upon depression, post-traumatic stress

disorder ("PTSD"), diminished self-esteem, difficulty sleeping, panic attacks, and

anxiety. (Tr. 45).  Plaintiff also claims physical limitations based upon pain in her

right knee, left shoulder, and back; sleep apnea; and palpitations.  (Tr. 155, 238).  The

medical evidence includes treating physician and psychiatrist records, examining

expert opinions, and a non-examining disability expert assessment.

### A.    Treating Physicians

Plaintiff has been treated for mental impairments by her psychiatrist, Lisa

Catapano-Friedman, M.D.   Dr. Barney Rubenstein and Dr. Anthony Turi have treated

plaintiff for physical impairments.

### 1.    Mental Impairments

Psychiatrist Lisa Catapano-Friedman, M.D. treated plaintiff almost monthly

between January 2001 and September 2002. (Tr. 158-65, 205-13).[1]  During plaintiff's

first appointment in January 2001, plaintiff told Dr. Catapano-Friedman that she

loved teaching but was unsure she wanted to go back, and that she felt okay except

when she was thinking about school. (Tr. 205).  Plaintiff also stated that she felt

---

[1] The complete set of Dr. Catapano-Friedman's reports appears at Tr. 205-13.  The documents at Tr. 158-65 are incomplete duplicates of the same reports.

4

uncomfortable going out of her house because of fear of running into people, but felt better and was taking one day at a time.  (Tr. 205).

In February 2001, Dr. Catapano-Friedman reported that plaintiff was having panic attacks that stopped when plaintiff stopped taking the Prednisone that had been prescribed for her pneumonia. (Tr. 206).  Dr. Catapano-Friedman stated that plaintiff had been prescribed both Ativan[2] and Ambien[3] which "worked." (Tr. 206).

In April 2001, plaintiff told Dr. Catapano-Friedman that she was feeling well and was enjoying things except when thinking about school. (Tr. 209).  In May 2001, plaintiff reported that she was swimming daily and felt good.  (Tr. 209).  In August and September of 2001, plaintiff reported that she was enjoying working with her dogs, but became "instantly tearful" when talking about past events with the principal. (Tr. 209).  In September 2001, plaintiff stated that she missed doing her job, but could not work for her principal. (Tr. 210).  Plaintiff also told Dr. Catapano-Friedman that she had attempted teaching piano lessons, but had become very anxious the day before she was scheduled to teach.  (Tr. 210).

In November 2001, plaintiff told Dr. Catapano-Friedman that she felt pressured to return to work for financial reasons, but felt more "down" when she thought about working under pressure. (Tr. 210).  Dr. Catapano-Friedman suggested plaintiff "readjust to the world" by working part-time in a "low pressure position."  (Tr. 210).

---

[2] Ativan is an anti-anxiety medication.

[3] Ambien is a medication used as a sleep aid.

5

In December 2001, plaintiff stated that she felt she could not work around her principal, but missed her job. (Tr. 211). In January 2002, plaintiff informed Dr. Catapano-Friedman that she had been approached about another job but felt "afraid of failure." (Tr. 211).

In February 2002, plaintiff indicated to Dr. Catapano-Friedman that she didn't think she could go back to work at her former school and got tearful thinking about working with her principal. (Tr. 211). In May 2002, plaintiff stated that she was pursuing another job. (Tr. 212). In July 2002, Dr. Catapano-Friedman wrote that plaintiff was planning to return to work and was helping her church write a grant application. (Tr. 212). In August 2002, plaintiff reported increased anxiety about returning to school, but in September 2002 plaintiff reported that she had returned to school and was pleased with her classes. (Tr. 212).

In July 2001, Dr. Catapano-Friedman wrote a letter stating that she had been treating plaintiff since January 2001 for depression and PTSD. (Tr. 207). Dr. Catapano-Friedman also stated that plaintiff was taking prescribed medication that made her feel and function better outside of the school setting, but was unable to return to the school setting because of her PTSD. (Tr. 207). Dr. Catapano-Friedman stated that plaintiff would not be able to work in a school for the foreseeable future. (Tr. 207).

### 2.    Physical Impairments

Barney Rubenstein, M.D., plaintiff's long-standing primary care physician,

treated plaintiff numerous times between January 2001 and September 2002. (Tr. 47).
In January 2001, plaintiff complained of bronchitic symptoms and stated that her
heart was "racing." (Tr. 150). Dr. Rubenstein believed that plaintiff's chest
discomfort was related to bronchospastic disease and infection. (Tr. 150). In
February 2001, Dr. Rubenstein noted plaintiff looked "clinically stable," but stated
that the source of plaintiff's palpitations was unclear and suggested that medical tests
be performed. (Tr. 147).

        During the next few months, plaintiff was given a 24-hour Holter monitor to
test for palpitations (Tr. 140), a nuclear stress test (Tr. 89), and an echocardiogram
(Tr. 88). In April 2001, Anthony Turi, M.D., a board-certified cardiologist stated that
the echocardiogram results were "essentially normal" and the nuclear stress test
results showed "no evidence of ischemia," but a significantly diminished exercise
capacity. (Tr. 86). Dr. Turi indicated plaintiff had stress induced hypertension and
prescribed medication. (Tr. 86). Dr. Turi suggested plaintiff undergo a very
aggressive weight reduction program through diet and exercise. (Tr. 90-92). In July
2001, Dr. Turi stated that plaintiff's blood pressure was much improved and
suggested plaintiff continue with weight reduction and return in eight months for
reevaluation. (Tr. 85).

        In May 2001, plaintiff told Dr. Rubenstein that she was having less palpitations
and had better control over the palpitations. (Tr. 146). In July 2001, plaintiff told Dr.
Rubenstein that she had been swimming, and that her palpitations only occurred when

she had increased stress. (Tr. 145).  In October 2001, Dr. Rubenstein stated that plaintiff's hypertension had been under "remarkable" control and that plaintiff had not had any recent palpitations. (Tr. 144).  In November 2001, plaintiff complained of a fairly constant upper mid-back discomfort that had lasted for about a week.  Dr. Rubenstein ordered physical therapy and told plaintiff to return in a few weeks, but sooner if she did not improve.  (Tr. 143).

### B.    Consulting Physicians

Plaintiff was examined by two consulting physicians on January 21, 2001.  Amelita Balagtas, M.D. completed an orthopedic examination, and concluded that plaintiff had some limitations in activities requiring bending, lifting, ***prolonged*** sitting, and ***prolonged*** standing. (Tr. 167, 165-68).  She would also have some limitations in activities that required kneeling and squatting. (Tr. 167).  Plaintiff had full range of motion in the cervical spine, no pain or spasm in the cervical spine, no paraspinal spasm, and no SI joint or sciatic notch tenderness. (Tr. 166).  Plaintiff did have tenderness over the left lumbar paraspinal and at the right thoracic paraspinal, and a forward flexion of fifty degrees, beyond which she complained of pain. (Tr. 166).  Dr. Balagtas' prognosis was that plaintiff's conditions were "probably stable." (Tr. 167).

John Seltenreich, Ph.D. performed a psychiatric evaluation of plaintiff and diagnosed her with post-traumatic stress disorder, chronic major depression, and panic disorder with agoraphobia. (Tr. 169, 172).  Dr. Seltenreich noted that plaintiff

complained of fatigue, concentration problems, palpitations, panic attacks, nausea, and extreme distress at school. (Tr. 169).  Dr. Seltenreich found that although plaintiff could do all her personal grooming and assist with household chores, she did have a problem "*maintaining attention and concentration*." (Tr. 171)(emphasis added). Although the doctor found that plaintiff could understand and follow simple directions, he believed that she might not consistently perform simple tasks because of her various mental problems. (Tr. 171).

Dr. Seltenreich stated that his examination results were *consistent with* plaintiff's allegations of depression, PTSD, and panic disorder. (Tr. 171).  This finding directly addresses plaintiff's credibility.  Dr. Seltenreich stated in his report that based on other "consultations" that he performed "at the time in which [plaintiff] used to teach", there were unusual problems and stresses in that school system. (Tr. 172).  Dr. Seltenreich stated that the situation at plaintiff's school was "extremely stressful," but thought that with appropriate help *and* with a "changing of the guards" at the school, plaintiff's prognosis could be *fair*.  (Tr. 172).

## C.    Non-Examining Experts

A physical RFC and a mental RFC were completed in February 2002. (Tr. 173-80, 182-85).  The mental RFC was attached to a form in which plaintiff's mental impairments were evaluated to determine whether they were of "Listing" severity. (Tr. 186-99).

The physical RFC was completed by a disability "analyst," not a physician. (Tr.

9

180). This RFC indicated plaintiff could occasionally lift ten pounds, frequently lift less than ten pounds, stand for two hours during an eight hour work day, sit for six hours during an eight hour work day, and had no limitations to pushing or pulling. The RFC indicated that plaintiff should never climb, kneel, crawl, or crouch; and should only occasionally balance or stoop. (Tr. 173-80).

The mental RFC indicated that plaintiff's PTSD, major depression, and panic disorder with agoraphobia caused moderate limitation to plaintiff's ability to complete a normal workday and workweek without interruptions, to perform at a consistent pace without an unreasonable number of rest periods, to accept instructions and respond appropriately to criticism from supervisors, and to set realistic goals or make plans independently of others. (Tr. 183). The mental RFC also indicated that plaintiff's difficulties occurred primarily in the context of her specific job at her particular school. (Tr. 184).

## DISCUSSION

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months ...." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity
> that [she] is not only unable to do [her] previous work but cannot,

considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. §§ 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If [she] is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits [her] physical or mental ability to basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider [her] disabled without considering vocational factors such as age, education, and work experience; ... . Assuming the claimant does not have listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [she] has the residual functional capacity to perform [her] past work. Finally, if the claimant is unable to perform [her] past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920.

The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Bluvband v. Heckler*, 730 F.2d 886, 891 (2d Cir. 1984).

11

**1.     Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986.

In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).  A court's factual review of the Commissioner's final  decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)(citations omitted).  It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Co. v. NLRB*, 197 U.S. 229 (1938)).

"To determine on appeal whether an ALJ's findings are supported by

substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258. However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983).

**2.**     **Listed Impairment**

Plaintiff's first claim is that her impairments meet the severity of Listings 12.04 (Affective Disorders) or 12.06 (Anxiety-Related Disorders). Brief at 7-8.  The Listed Impairments appear in Appendix 1 of the Social Security Regulations. 20 C.F.R. Part 404, Subpt. P., App. 1.  As stated above, if a plaintiff's impairment or combination of impairments meet the severity of a Listed Impairment, then plaintiff will be found disabled at Step 3 of the five-step evaluation procedure, without considering plaintiff's age, education or prior work experience. 20 C.F.R. 404.1520.

In this case, the ALJ found that plaintiff's impairments did not meet or equal the severity of a listed impairment. (Tr. 20).  Although plaintiff argues that she meets this Listing severity, her brief does not cite to any portions of the record where there is support for the existence of the elements of either Listed Impairment.  The only analysis of the specific factors outlined in the two listed impairments in question

appears at pages 186-99 of the transcript.  This document is entitled "Psychiatric Review Technique" and is a form in which the symptoms of all the listed mental impairments are written. *Id.*  The non-examining physician, Dr. Richard B. Weiss reviewed the record and made a determination of whether the plaintiff had any of the symptoms and whether plaintiff's impairments met or equaled listing severity.[4]

In this case, Dr. Weiss reviewed plaintiff's record for symptoms of both Listed Impairments 12.04 and 12.06. (Tr. 186, 189, 191).  Dr. Weiss found that plaintiff had none of the specific symptoms from Listing 12.04. (Tr. 189).  He checked the box at the bottom of the page that stated that plaintiff had a medically determinable impairment that did not precisely satisfy the diagnostic criteria for this Listing. *Id.* With respect to Listing 12.06, Dr. Weiss found that plaintiff had anxiety with recurrent and intrusive recollections of a traumatic experience which were a source of marked distress. (Tr. 191).  However, Dr. Weiss then proceeded to consider the functional limitations imposed by the anxiety disorder and determined that although plaintiff had "moderate" limitations in social functioning and in maintaining concentration, persistence, or pace, she only had "mild" limitations in restriction of activities of daily living, and no episodes of decompensation of extended duration. (Tr. 196).  Finally, Dr. Weiss found that plaintiff did not establish the existence of the criteria listed in section "C". (Tr. 197).  Thus, Dr. Weiss found that plaintiff's

---

[4] The court notes that these listed impairments include three components, listed under sections "A",  "B", and "C" of the Listing.  The criteria in section A are the "medical" factors that substantiate the presence of a mental disorder, while the criteria in sections B and C are the impairment-related "functional" limitations. 20 C.F.R. Part 404, Subpt. P,  App. 1, § 12.00(A).

impairments were not of Listing severity.  The ALJ mentioned the Psychiatric Review Technique form in his decision, but did not specifically mention it in conjunction with an analysis of whether plaintiff had a listed impairment.

No other physician in the record has analyzed plaintiff's impairments under the specific criteria of Listed Impairments.  Because the existence of a Listed Impairment is step three of the five-step process, plaintiff still has the burden of showing that her impairments meet the severity of a Listed Impairment.  There is no indication in the record from any treating source that plaintiff meets either one of the listings cited.  Thus, the ALJ's finding that plaintiff's impairments are not of Listing-level severity is supported by substantial evidence.

**3.**      **Treating Physician and Residual Functional Capacity**

While a treating physician's opinion is not binding on the Commissioner, the opinion must be given controlling weight when it is well supported by medical findings and *not inconsistent with other substantial evidence*. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. § 416.927(d).  If the treating physician's opinion is contradicted by other substantial evidence, the ALJ is not required to give the opinion controlling weight. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). The ALJ must, however, properly analyze the reasons that the report is rejected. *Id.* An ALJ may not arbitrarily substitute his own judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

If the treating physician's opinion is not given controlling weight, the ALJ

must assess the following factors: the length of the treatment relationship; the frequency of examination for the condition in question; the medical evidence supporting the opinion; the consistency of the opinion with the record as a whole; the qualifications of the treating physician; and other factors tending to support or contradict the opinion. 20 C.F.R. §§ 404.1527(d)(2)-(d)(6); 416.927(d)(2)-(d)(6). Failure to follow the proper standard is a ground for reversal. *Barnett v. Apfel*, 13 F. Supp. 2d 312, 316 (N.D.N.Y. 1998)(citation omitted).

In rendering a residual functional capacity (RFC) determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R §§ 404.1545; 416.945. *See Martona v. Apfel*, 70 F. Supp. 2d 145 (N.D.N.Y. 1999)(citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Verginio v. Apfel*, 1998 WL 743706 (N.D.N.Y. Oct. 23, 1998); *LaPorta v. Bowen*, 737 F. Supp. at 183.

In this case, the ALJ found that plaintiff could return to her previous work. In making this determination, he found that because plaintiff's "main" problem resulted from the principal at one school, plaintiff could have worked "for someone other than that person during the period in question. (Tr. 17, 20). In the alternative, the ALJ found that even if plaintiff could not return to her previous work, she had plenty of

transferable skills that would allow her to perform a full range of light and sedentary activities. (Tr. 20).

The ALJ states that he gave great weight to the opinion of Dr. Seltenreich, but rejected Dr. Catapano-Friedman's opinion that plaintiff was "unable to return *to the school setting and [did] not see her being able to do so in the foreseeable future."* (Tr. 17)(emphasis added).  The ALJ cited other portions of Dr. Catapano-Friedman's reports and found that the opinion that plaintiff could not return to her previous work was inconsistent with the doctor's progress notes. (Tr. 18).  One of the progress notes cited by the ALJ stated that plaintiff told Dr. Catapano-Friedman that plaintiff spent her day sewing, watching television, doing puzzles and crafts, and reading. (Tr. 19). The ALJ found this statement to be inconsistent with plaintiff's allegation that she was unable to focus or concentrate. (Tr. 18-19).  The court would point out that when the ALJ asked plaintiff at the hearing about her ability to engage in these activities, she stated that she tried to do these things, and that she did not complete the activities and although she watched television, she stated that she was not able to remember what she saw. (Tr. 238).

The ALJ states that in reaching "this conclusion"[5], the ALJ considered the "psychiatric review technique." (Tr. 18).  The ALJ then finds, apparently based on this form, that plaintiff has "no" restrictions of daily living; a "mild to moderate"

---

[5] Since this paragraph follows the paragraph in which the ALJ rejects Dr. Catapano-Friedman's opinion, the court assumes that "this conclusion" is the decision to reject Dr. Catapano-Friedman's statement that plaintiff could not return to her prior work.

17

impairment in social functioning, and only "mild" difficulties in maintaining concentration, persistence or pace. (Tr. 18).  The ALJ misquotes the form almost completely.  The form actually states that plaintiff has "mild," not "*no*," restrictions on the activities of daily living; "moderate," *not* "mild to moderate," restrictions in both social functioning and in maintaining concentration, persistence, and pace.

Since there is only *one* psychiatric review technique form in the record, it is clear that the ALJ has misquoted the record, and if he has based his decision to reject Dr. Catapano-Friedman's opinion regarding plaintiff's ability to return to her former job on this form, then the ALJ's decision is *not* supported by substantial evidence. There is no contradictory opinion in the record to Dr. Catapano-Friedman's opinion that plaintiff could not return to the "school setting."

The ALJ states that plaintiff could have worked for someone other that the principal in her school.  However, the ALJ is forming a medical opinion that none of the doctors expressed.  The ALJ appears to be looking at the cause of plaintiff's mental impairment (the principal), rather than looking at the result of that mental impairment.  The record shows that plaintiff clearly had a severe mental breakdown that continued for more than one year and resulted in her remaining secluded in her home and restricting her activities to simple tasks.  While the root cause of plaintiff's mental breakdown was a specific person in her school, the result was plaintiff's inability to function at a regular job, and her treating psychiatrist fully supports her allegations of an inability to perform her work during the time period in question. (Tr.

18

160, 208).

Although the ALJ cites Dr. Seltenreich's opinion and states that he gives it "great weight," Dr. Seltenreich makes very specific findings that are completely consistent with the reports of plaintiff's treating psychiatrist. Dr. Seltenreich found that his examination results were *consistent* with plaintiff's allegations of depression, PTSD, and panic disorder. (T. 171). Dr. Seltenreich found that plaintiff's prognosis would be *fair* only if plaintiff were able to continue treatment and the management of the school changed. Dr. Seltenreich had very specific knowledge regarding the stressful environment in the school system in which plaintiff was employed.

Additionally, although Dr. Seltenreich found that plaintiff could understand and follow simple directions and instructions as well as perform "*simple rote tasks under supervision*," Dr. Seltenreich also specifically stated that plaintiff had a problem in maintaining attention and concentration and might *not* be able to consistently perform simple tasks because of her various mental problems. (Tr. 171). The ALJ did not cite this important portion of Dr. Seltenreich's report. The ALJ may not "pick and choose" evidence supporting his conclusions while ignoring other substantial evidence. *Rivera v. Sullivan*, 771 F. Supp. 1339, 1354 (S.D.N.Y. 1991). This is particularly true if the ALJ relies on part of one report, while ignoring the part of the same report that supports plaintiff's claim.

The court also notes that the ALJ's finding about plaintiff's *physical* RFC is also not supported by substantial evidence. The ALJ found that plaintiff could have

*physically* performed a "full range" of "light and sedentary" work activity. (Tr. 20). In making this determination, the ALJ stated that "at the hearing," plaintiff testified that she could lift 20 pounds.  However, that statement does not appear in the transcript.[6]  When the ALJ asked plaintiff what was the heaviest weight she could lift, she stated "I carry books around." (Tr. 224).

Dr. Balagtas stated that plaintiff would have had *some* limitations with many physical functions, but never states what those limitations were.  (Tr. 167).  There is nothing in Dr. Balagtas's report stating that plaintiff could lift twenty pounds (the amount of lifting ability required for light work).  The disability analyst states that plaintiff could only lift and carry 10 pounds occasionally and less than 10 pounds frequently. (Tr. 174).  Thus, it is unclear how the ALJ determined that plaintiff could perform a *full range* of light and sedentary work, given plaintiff's mental and physical restrictions.  By mis-citing the plaintiff's testimony, mis-citing medical reports, and citing portions of the doctors' reports, but ignoring other sections that supplement or explain the statement cited, the ALJ's rejection of the treating physician's opinion that plaintiff could not return work and the ALJ's conclusion that plaintiff could return to her prior work are not supported by substantial evidence.

**4.**   **Credibility**

As the fact-finder, the ALJ's function includes evaluating the credibility of all witnesses, including the plaintiff. *See Carroll v. Secretary of HHS*, 705 F.2d 638, 642

---

[6] The only time during the testimony that plaintiff mentions "20 pounds" is when she was talking about her weight, and she stated that she had "dropped 20 pounds."  (Tr. 231).

(2d Cir. 1983).  The ALJ is free to accept or reject a witness's testimony, however, a finding that the witness is not credible must be set forth with sufficient specificity to permit "an intelligible plenary review of the record." *Williams o/b/o Williams v. Bowen*, 859 F.2d 255, 260-61 (2d Cir. 1988)(citing *Carroll*, 705 F.2d at 643).  To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two step analysis of pertinent evidence in the record.  *See* 20 C.F.R. §§ 404.1529, 416.929; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. March 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged...."  20 C.F.R. §§ 404.1529(a), 416.929(a). Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which they limit the claimant's capacity to work. *Id.* §§ 404.1529(c), 416.929(c).

When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any

medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. *Id.* §§ 404.1529(c)(3), 416.929(c)(3).

In this case, the ALJ finds that plaintiff's allegations of disability are not fully credible. (T. 19). This is contrary to the opinion of the independent examining psychologist, Dr. Seltenreich, who found that the results of plaintiff's examination were "consistent with the allegations of depression, post-traumatic stress disorder, and panic disorder." (Tr. 171). In rejecting plaintiff's testimony that she was unable to focus or concentrate, (Tr. 18-19), the ALJ cited Dr. Seltenreich's report which stated that the "claimant's attention and concentration were intact." (Tr. 19). However, as stated above, the ALJ did not quote the part of the ***same report***, that stated that plaintiff "does have problems maintaining attention and concentration for tasks." (Tr. 171). The ALJ cannot pick and choose parts of medical reports while ignoring other substantial evidence that appears in the same report. *Rivera, supra.*

Thus, the ALJ rejected plaintiff's testimony, in part on a possible misinterpretation of Dr. Seltenreich's report. The record also contains a statement from a Social Security Disability Analyst, who examined the record in February of 2002. (Tr. 178). The analyst specifically stated that plaintiff's "complaints are credible" and that "[r]ecords in [the] file support her claims." *Id.* Thus, the ALJ's credibility determination is not supported by substantial evidence.

**5.**     <u>**Other Work**</u>

In the ALJ's decision, although he found that plaintiff could return to her former work as long as she did not work for the principal who caused her breakdown, the ALJ also found that, even if she could not return to her former work, she could perform a full range of light and sedentary jobs, "other than school work." (Tr. 20). Thus, the ALJ made an alternative finding at step five of the analysis that plaintiff could perform other work.

I find that this cursory conclusion by the ALJ is insufficiently supported for the same reasons that his finding that she could perform her prior work are not supported by substantial evidence.  If she could not perform her previous work, and her impairments are mostly mental (non-exertional) in nature, there would have to be a determination of how her mental impairments would have affected her ability to perform other work.  It appears from his decision that the ALJ in this case simply assumed that if she were not working for the principal who caused her mental impairment, that she would have no limitations and because she had transferable skills, she would not be disabled.  This simply is not supported by any evidence in the record, and the ALJ's attempt to make a conclusory finding at step five is unsupported.

**6.**     <u>**Remand or Reversal**</u>

This court has found that the ALJ's decision is not supported by substantial evidence.  The court must now determine whether remand for additional proceedings

or reversal with a remand for calculation of benefits is appropriate.  Remand to the

Commissioner for further development of the evidence is appropriate when there are

gaps in the administrative record or where the ALJ has applied an improper legal

standard. *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999).  Reversal for

calculation of benefits is appropriate only if the record contains persuasive proof of

disability and a remand for further evidentiary proceedings would serve no useful

purpose. *Id.*

      In this case, the ALJ has incorrectly rejected the opinion of treating and

examining physicians, has improperly rejected her credibility, and has improperly

determined that plaintiff could return to her former work.  However, it is unclear

whether plaintiff's treating psychiatrist was stating that plaintiff could not return to

teaching or whether she could not return to ***any*** substantial gainful activity during the

time in question.  In July of 2001, Dr. Catapano-Friedman specifically stated that

plaintiff could not return to the "school setting." (Tr. 207).  The entire note refers to

plaintiff being unable to enter "the school" and states that plaintiff was taking

medication that allowed her to function better "outside of the school setting." (Tr.

207).

      It appears that Dr. Catapano-Friedman was speaking ***specifically*** about plaintiff

being disabled form teaching, and ***not*** making a determination of whether plaintiff

could have performed any ***other*** work.  There has been no determination by a

physician that plaintiff could not perform other work in the national economy during

the period in question.  Thus, the ALJ has applied improper legal standards, there are gaps in the record, and no persuasive evidence of disability.  Therefore, the court finds that it is appropriate to remand for a further evaluation of this case.

On remand, further information should be obtained from plaintiff's treating psychiatrist regarding her mental abilities to perform *other* work during the closed period.  Plaintiff's physical RFC should also be re-evaluated.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the Commissioner's decision be **REVERSED and REMANDED** pursuant to **SENTENCE FOUR** of 42 U.S.C. § 405(g) for further proceedings consistent with this Report.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: January 8, 2007

_____
Hon. Gustave J. DiBianco
U.S. Magistrate Judge